```
                  UNITED STATES DISTRICT COURT
                   DISTRICT OF MASSACHUSETTS


KEVIN and NANCY O'NEIL,               )
INDIVIDUALLY, and as                  )
ADMINISTRATORS OF THE ESTATE          )
OF LIAM E. O'NEIL,                    )
                                      )
     Plaintiff,                       )
                                      )       CIVIL ACTION NO.
v.                                    )       06-10433-DPW
                                      )
ELECTROLUX HOME PRODUCTS, INC.,       )
HUSQVARNA FOREST AND GARDEN CO.,      )
and WCI OUTDOOR PRODUCTS, INC.,       )
                                      )
     Defendants.                      )
```

MEMORANDUM AND ORDER
September 7, 2010

Plaintiffs Kevin and Nancy O'Neil (the "O'Neils") seek a new trial under Federal Rule of Civil Procedure 59(a)(1)(A) on grounds that a jury instruction they requested and to which they did not object when the jury was charged following closing arguments was erroneous when delivered to the jury in writing in response to a question submitted by the jury during their deliberations. The jury in this products liability action involving the death of the O'Neils' young son returned a verdict in favor of defendants Electrolux Home Products, Inc., Husqvarna Forest and Garden Co., and WCI Outdoor Products, Inc. (collectively, the "defendants") shortly after receiving the supplemental written instruction. Upon consideration of the record as a whole and the supplemental instruction in particular,

I find that the written instruction neither misstated the law nor prejudiced the O'Neils; consequently, no new trial is warranted. Accordingly, I will deny the motion.

## I. BACKGROUND

This products liability case arises from a tragic accident in which Kevin O'Neil accidentally backed over his two-and-one-half years old son Liam with a lawn mower and grass catcher designed, manufactured, marketed, and sold by the defendants. Liam died as a result of the incident. His parents, individually and as administrators of his estate, filed this diversity action asserting claims against the defendants for negligence and gross negligence; willful, wanton, and reckless misconduct; breach of warranty; and violations of chapter 93A of the General Laws of Massachusetts. *See generally O'Neil v. Electrolux Home Prods., Inc.*, No. 06-10433, 2008 WL 2066948 (D. Mass. May 14, 2008) (granting, in part, defendants' motion for summary judgment). The dispositive claim ultimately presented to the jury at trial was that of breach of warranty by design defect.

At the end of a six-day trial, I gave the following instruction to the jury with respect to proof of design defect:

> To determine whether there was a design defect you should consider whether the product had a potential, sometimes referred to as a propensity, resulting from the manufacturer's conscious design choice that rendered the product unreasonably dangerous to foreseeable users and, therefore, unfit for its ordinary foreseeable uses. . . .

This was essentially the instruction that the O'Neils requested.[1] I also listed factors that the jury could consider when determining "whether or not the defendants' lawn mower was reasonably safe." Those factors included:

> the gravity of the danger that's posed by the design, the likelihood that such a danger would, in fact, occur, whether the risk posted by the product could have been reduced by the use of another alternative reasonable design, the mechanical feasibility of some safer, alternative design, the financial cost of such an alternative design, any trade-offs, in terms of adverse consequences to the product or to the consumer that would result from an alternative design, whether the proposed alternative modification of the design would make - would cause - undue interference with the use or utility of the product [and] whether the product met the consumer's reasonable expectations, as to safety.

Finally, I instructed the jury as to each question on the special verdict form. The first question asked: "Was the lawnmower unreasonably dangerous as a result of being defectively manufactured or defectively designed?" The jury was told that a negative response to that question would end deliberations and render a verdict in favor of the defendants. Neither party objected to this instruction.

Several hours after the jury retired to deliberate, it

---

[1] The O'Neils' proposed instruction read: "To determine whether there was a design defect, you should consider whether the product had any propensity resulting from the manufacturer's conscious design choices that rendered the product *unreasonably dangerous to its foreseeable users*, and therefore unfit for its ordinary foreseeable uses." (emphasis added and footnote omitted).

3

submitted a question to the court, asking "[w]hat is the definition/criteria of unreasonably dangerous?  Also, could you please list the criteria."  Because I had drafted a written version of this portion of the jury instruction in preparation for charging the jury, and the court reporter was unavailable to read back the transcript, I informed the parties that I intended to submit my text to the jury in response to its question.  The O'Neils' counsel objected to the phrase "unreasonably dangerous to its foreseeable users" and suggested substituting "to its foreseeable users or foreseeable bystanders."  While conceding that this proposed amendatory language was not inaccurate, defendants' counsel objected to changing the text of the instructions given during the jury charge and to which the O'Neils had not objected at that time.  I decided to use the original "language that was provided to the jury without objection," noting that "the focus of the question [was not on] providing further elucidation."  My text of the oral instruction was submitted to the jury, and, shortly thereafter, the jury returned a verdict in favor of the defendants.

## II. ANALYSIS

While the decision to grant a new trial is within the trial court's discretion, that discretion is "limited to those circumstances in which allowing the verdict to stand would result in a miscarriage of justice." *O'Rourke v. City of Providence*, 235 F.3d 713, 726 (1st Cir. 2001) (citation omitted).

4

When, as here, the asserted ground for a new trial is an erroneous jury instruction, I must first determine whether the moving party preserved its objection to the instruction and, if so, whether the instruction was indeed erroneous.  *Wilson v. Mar. Overseas Corp.*, 150 F.3d 1, 6 (1st Cir. 1998).  If the instruction was erroneous, I must then determine whether that error was harmless.  *Id.*  The ultimate issue before me now, consequently, is whether the challenged instruction "adequately explained the law or 'whether [it] tended to confuse or mislead the jury on the controlling issues.'"  *Davet v. Maccarone*, 973 F.2d 22, 26 (1st Cir. 1992) (quoting *Brown v. Trs. of Boston Univ.*, 891 F.2d 337, 353 (1st Cir. 1989)) (citation omitted); *see also Boyd v. Ill. State Police*, 384 F.3d 888, 894 (7th Cir. 2004) (stating that, in reviewing supplemental jury instructions, the court must "only . . . determine if taken as a whole they were sufficient correctly to inform the jury of the applicable law" (citation omitted)).  In making this determination, I may not consider the challenged instruction in isolation but rather must consider the instruction in the context of the entire record and the jury charge as a whole.  *See Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 552 F.3d 47, 72 (1st Cir. 2009) ("An error in jury instructions warrants reversal only if the error is determined to have been prejudicial based on a review of the record as a whole." (citations omitted)).

**A.   Was the Objection Waived?**

To preserve a challenge to a jury instruction properly, the moving party must have objected to the instruction, on the record, either before the jury was charged or, if "a party was not informed of an instruction . . . before that opportunity to object, . . . promptly after learning that the instruction or request will be, or has been, given or refused."  Fed. R. Civ. P. 51(c); *see also Wilson*, 150 F.3d at 6-7.  The defendants contend that the O'Neils' failure to object to an identical instruction given orally during the jury charge constitutes a waiver of any objection to that same language in supplemental form.  While it is true that the O'Neils' failure to object to the oral instruction following closing arguments waived any challenge to *that* instruction at *that* time, the plaintiffs objected to the language of the written, supplemental instruction promptly after I announced my intent to submit the text in response to the jury's question.  The O'Neils, therefore, preserved their objection to the supplemental written response to the jury's question.  The O'Neils' counsel articulated the nature of the objection on the record, defendants' counsel had an opportunity to respond, and I considered both parties' arguments before arriving at my decision to submit a written response to the jury. *See Wilson*, 150 F.3d at 7 ("The emphasis is not on the form of objections, but rather on ensuring that the trial court had actual notice of the nature and grounds of the objection.").

**B.   Was the Written Instruction Prejudicial?**

Having found the O'Neils' objection to the written instruction to have been properly preserved, I must next consider whether they have demonstrated "that the instruction in question was misleading or gave an inadequate understanding of the law." *First Act Inc. v. Brook Mays Music Co.*, 429 F. Supp. 2d 429, 432 (D. Mass. 2006) (citation and internal quotation marks omitted). The O'Neils argue that omitting the requested "foreseeable bystander" language from the supplemental instruction misstated the law and prejudiced the jury because it implied that the defendants were liable only to foreseeable users of the lawn mower and not to foreseeable bystanders like Liam.  I disagree. The written instruction accurately reflected Massachusetts law and, in any event, the full jury charge in the context of both parties' opening and closing statements and the testimony at trial adequately apprised the jury that the defendants could be liable for injuries to Liam even though he was not a "user" in the limited sense that it was his father, and not he, who was operating the lawn mower.

The written, supplemental instruction advised the jury, in relevant part, to consider whether a design defect in the lawn mower had a propensity to render the machine "unreasonably dangerous to its foreseeable users."  This is the language found in settled Massachusetts case law.  *Back v. Wickes Corporation*,

which the plaintiffs acknowledge is the "seminal" Massachusetts breach-of-warranty case, framed the relevant issue as "whether this propensity [to be unreasonably dangerous], resulting from conscious design choices of the manufacturer, rendered the product *unreasonably dangerous to its users* and therefore unfit for [its foreseeable use]."  378 N.E.2d 964, 970 (Mass. 1978) (emphasis added).  Subsequent Massachusetts cases have continued to employ this "foreseeable user" language.  *See, e.g.*, *Santos v. Chrysler Corp.*, 715 N.E.2d 47, 56-57 (Mass. 1999) (framing the issue before the jury as "whether this propensity [for the brakes to lock up], resulting from conscious design choices of the manufacturer, rendered the product *unreasonably dangerous to its users*" (quoting *Back*, 642 N.E.2d at 970) (emphasis added and quotation marks omitted)); *Rice v. James Hanrahan & Sons*, 482 N.E.2d 833, 836 (Mass. Ct. App. 1985) (describing the issue as whether "the product was in a defective condition *unreasonably dangerous to the user or consumer* at the time of sale, that is, unfit for [its] ordinary purposes" (citations omitted and emphasis added)).  The supplemental instruction thus directly followed and accurately reflected language from the relevant Massachusetts law.

The O'Neils' failure to object to the oral version of this instruction is a reflection of this settled understanding that the instruction was proper.  In fact, not only did the O'Neils

not object to this language when it was read to the jury during the jury charge, but, as noted, *see supra* Note 1, they requested the same language in the proposed jury instructions that they submitted to the court before charging. The O'Neils' requested instruction was identical in all respects - including footnotes and citations - to the model Massachusetts jury instructions gathered by Massachusetts Continuing Legal Education. *See* 1 Massachusetts Superior Court Civil Practice Jury Instructions § 11.3.2(c) (Mass. Continuing Legal Educ. ed., 2003). The written instruction as given was similarly consistent.

In the context of the whole record and the entire jury charge, the instruction was not misleading. In charging the jury, I followed an explanation of the first special verdict question at issue in this motion with an instruction as to the required showing that Kevin O'Neil was using the lawn mower for a foreseeable use at the time of the accident and that the design defect was the proximate cause of Liam's death. In describing the proof necessary for causation, I instructed the jury in some detail that the plaintiffs were required to prove that Liam O'Neil's death was due to a design defect for which the defendants are responsible. This instruction contemplated that the defendants could be liable for Liam's death even though he himself was not operating the lawn mower and, in that sense, was not the actual user.

The O'Neils' counsel, in his closing argument, also discussed each question of the special verdict form.  Counsel explained that the purpose of the first jury question was to determine whether the lawn mower and grass catcher were unreasonably dangerous because of their design and referred to factors useful in that consideration such as the frequency of prior injuries to children-bystanders by this kind of lawn mower and the feasibility of altering the design to better protect such children.  Counsel also referenced factors relevant to answering the second jury question, that is, whether the lawn mower's design caused Liam's death, an approach that emphasized that the defendants' potential liability encompassed harm to children-bystanders.  The jury could be in no doubt, after closing arguments, the jury charge, and five days of testimony on the defendants' and the industry's awareness of and approach to child safety, that the defendants would be liable for Liam's and the O'Neils' injuries if it found that the lawn mower contained a design defect that proximately caused Liam's death.

### III. CONCLUSION

The O'Neils have failed to demonstrate that the supplemental jury instruction was improper or, more fundamentally, that it resulted in a "miscarriage of justice" such that a new trial is warranted.  See *O'Rourke*, 235 F.3d at 726.  Finding that the written jury instruction accurately reflected the law and did not

mislead or confuse the jury, I DENY the motion for a new trial (Dkt. No. 123).

> */s/ Douglas P. Woodlock*
> DOUGLAS P. WOODLOCK
> UNITED STATES DISTRICT JUDGE